IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs on August 7, 2012

**ANTHONY BOND v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 00-03095    J. Robert Carter, Jr., Judge**

_____

**No. W2011-02218-CCA-R3-PC  - Filed January 24, 2013**

_____

Petitioner, Anthony Bond, appeals from the post-conviction court's denial of his petition for post-conviction relief following an evidentiary hearing.  Following a second jury trial after his first conviction was reversed and he was granted a new trial, Petitioner was again convicted for first degree murder.  This court affirmed his conviction on direct appeal. Petitioner filed a timely petition for post-conviction relief in which he alleged that his trial counsel was ineffective for failing to call an expert witness to challenge the State's medical expert's testimony regarding the victim's cause of death.  After a careful review of the record before us, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Jeff Woods and Neil Umsted, Memphis, Tennessee, for the appellant, Anthony Bond.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Betsy Weintraub, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts*

Petitioner was indicted by the Shelby County Grand Jury for first degree murder arising from the robbery and shooting of an armored truck guard in Memphis on April 21, 1997.  The victim died on October 2, 1999.  Petitioner and his co-defendant, Andrew

Thomas, were both convicted of first degree felony murder. Petitioner was sentenced to life without parole, and Thomas was sentenced to death. On appeal, Thomas' conviction and sentence were affirmed, but Petitioner was granted a new trial due to reversible error in the jury instructions. *See State v. Andrew Thomas and Anthony Bond*, No. W2001-02701-CCA-R3-DD, 2004 WL 370297 (Tenn. Crim. App. at Jackson, Feb. 27, 2004). Following a second jury trial, Petitioner was again convicted of first degree murder and sentenced to life without parole. This court affirmed his conviction on direct appeal. A summary of the facts underlying Petitioner's conviction can be found in this court's opinion affirming the conviction. *See State v. Anthony M. Bond*, No. W2005-01392-R3-CD, 2006 WL 2689688 (Tenn. Crim. App., at Jackson, Sept. 20, 2006), *perm. app. denied* (Tenn., Jan. 29, 2007). As pertinent to the issues in this appeal, the evidence at trial included the following:

Dr. O.C. Smith, the Shelby County Medical Examiner, testified that the victim died "as a result of sepsis, secondary to a ruptured neurogenic bladder, and gunshot wound to the head." He described sepsis as "an overwhelming body infection that is caused by a bacteria that escapes from a localized area, and gets in the bloodstream, and infects many of the body's tissues." According to Dr. Smith, the victim's gunshot wound caused bleeding and blood clots that resulted in paralysis, which, in turn, caused his bladder to become "very fragile" and rupture. During the autopsy, Dr. Smith did discover that the victim had ninety percent blockage in one of his arteries, a fatty liver, and damaged kidneys, but it was his opinion that none of these conditions caused the victim's death. The doctor was also of the opinion that the victim's death was not the result of Ms. Day's [the victim's wife] failure to properly clean his catheter. He testified that the victim had been very well cared for based on the lack of bed sores on his body.

On cross-examination, Dr. Smith acknowledged that after the shooting, the victim's doctors were concerned with blood clots and that one of them prescribed Coumadin, a blood thinner. He also confirmed that although the victim had been paralyzed from his chest down, he had regained use of his arms. Medical records indicated that the victim was able to walk with the aid of a rolling walker and "standby assistance" for distances of up to forty feet by the end of his physical therapy. Records suggested that the victim might be capable of returning to work at a "sedentary level."

Dr. Smith confirmed that the hospital had issued a death summary identifying the final diagnosis as urosepsis, which is sepsis that originates in the urinary tract; that a second diagnosis on the summary was "intra-

abdominal bladder rupture"; that the third was "New Onset Diabetes Mellitus," or high blood sugar; and a fourth diagnosis was listed as "Coumadin toxicity." Dr. Smith explained that Coumadin toxicity can result in making a person's body "much more prone to bleed internally." It was his view, however, that Coumadin did not cause sepsis. Also listed in the summary was a fifth diagnosis of "paraplegia secondary to gunshot wound." Dr. Smith diagnosed the victim as having died as a result of sepsis, ruptured neurogenic bladder, gunshot wound to the head, "remote," visceral congestion, and visceral petechiae. He explained that he used the term remote because "the gunshot wound occurred at some time sufficient in the past, and it ha[d] healed, and that the immediate effect of being shot ha[d] passed." He conceded that determining a cause of death is not an "exact science" but maintained his opinion that the death "related back to . . . the delayed effects of the gunshot wound."

The defense did not offer any evidence.

*Id*. 2006 WL 2689688, at *4-5.

At the post-conviction hearing, Petitioner's lead trial counsel (trial counsel) testified that he was appointed by the trial court to represent Petitioner on the charge in this case. Another attorney was appointed as co-counsel because the State had filed a notice of intent to seek the death penalty. Trial counsel testified that Petitioner pleaded guilty in federal court with regard to "the underlying felony, which was the armored car robbery . . . ." The victim in this case was living at the time of the federal prosecution and testified in that case. Trial counsel testified that Petitioner "fully cooperated" with the Assistant U.S. Attorney, admitting his involvement in the crime and testifying against co-defendant Thomas. In light of Petitioner's guilty plea to the underlying felony, trial counsel decided to concentrate his defense on the medical causation of the victim's death given the time span between the shooting and the victim's death. Trial counsel did not specifically recall what the victim's medical records showed, but he testified, "I know I read hundreds of pages of medical records. I also know that I had other people read them and synopsize them for me as well as discussed experts with that."

Trial counsel testified that Dr. Smith's testimony was taken by deposition because he was not available for trial, and it was admitted over trial counsel's objection. He also objected to another State's medical expert being allowed to testify "because we saw it as piling it on at that point in time." Trial counsel testified that in the first trial, he and co-counsel and both attorneys for co-defendant Thomas consulted with "a Dr. Hayne or Hayes or something similar to that" who indicated "that he would not be of assistance to us with

regards to causation." Trial counsel testified, "In the second trial, . . . I was trying to pinpoint a more specific argument, I originally went to Dr. Alabaster who is a urologist, because as I recall, the cause of death was sepsis as a result of a ruptured bladder." Trial counsel testified that he pursued a defense theory that there were intervening causes of death. Trial counsel did not recall speaking to a neurologist in preparation for trial. He testified that he focused on the victim's condition at the time of death rather than on his condition or injuries at the time of the shooting because "the further you got out on that time pendulum, the stronger the argument was to break the link as compared to a possible negligent act by a doctor [at the time the victim was admitted to the hospital for the gunshot wound]." Trial counsel testified that Dr. Alabaster could not testify to a reasonable degree of medical certainty that the State's medical expert's conclusion was wrong. He reviewed the victim's medical records with Dr. Saslawsky, who determined that the victim was improperly medicated, but Dr. Saslawsky advised that he also could not testify to a reasonable degree of medical certainty that it was the cause of the victim's death.

Trial counsel testified that he thoroughly cross-examined Dr. Smith at trial about the victim's medical records. He hired nurse practitioners to review and explain the victim's medical records to him. He testified, "I did whatever I could to become as much of a medical expert as would be possible for a lawyer to examine somebody at trial."

Petitioner testified that trial counsel represented him at his first and second trials. He testified that trial counsel met with him on "[n]umerous occasions" and provided him with discovery. Petitioner requested that trial counsel investigate the victim's cause of death. They discussed calling an independent medical expert as a witness. Petitioner testified that prior to his first trial, trial counsel told him that he spoke to "his friend[,]" Dr. Saslawsky, but that Dr. Saslawsky would not be able to testify at trial because he "didn't know what the cause of death" was. Petitioner testified that during his second trial, trial counsel "said he [would] look into it but he ain't never come back and talk to me about it, nothing else about no cause of death." Regarding trial counsel's representation of Petitioner in his first trial, Petitioner testified that trial counsel "put forth an effort." Regarding trial counsel's representation of Petitioner in his second trial, however, Petitioner testified, "I just feel like it was a sham, because he ain't just basically do nothing."

In a written order denying relief, the post-conviction court made the following findings and conclusions:

> In the case at hand, Petitioner participated in a robbery during which a guard was shot in the head. The victim later died as a result of the shooting. "One who inflicts (or in this case is criminally responsible for the

-4-

infliction) a dangerous wound upon another is held for the consequences flowing from such injury[.]" [citation omitted]

Petitioner's trial counsel consulted numerous experts and attempted, to the best of his ability, to provide a successful defense for Petitioner. The jury chose to believe the State's witnesses in this matter. An unsuccessful result does not automatically indicate deficient performance by the attorney.

The Petitioner has failed to prove that his trial counsel's performance was deficient.

*Analysis*

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this court is bound by the post-conviction court's findings unless the evidence in the record preponderates against those findings. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This court may not reweigh or reevaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. *See State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for trial counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580.

As noted above, this court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. *See id*. at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . . ; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *Burns*, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins*, 911 S.W.2d at 347. This court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id*. However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Petitioner asserts that his trial counsel was ineffective for failing to call a medical expert to challenge the victim's cause of death. This same issue was decided by this court on appeal from the denial of Petitioner's co-defendant Thomas's post-conviction petition. *See Andrew Thomas v. State*, No. W2008-01941-CCA-R3-PD, 2011 WL 675936 (Tenn. Crim. App. at Jackson, Feb. 23, 2011), *perm. app. denied* (Tenn., Aug. 25, 2011). In that case, Thomas asserted that his trial counsel "failed to adequately present a defense against medical causation thereby depriving [Thomas] of effective assistance of counsel." This court concluded,

> [T]his Court need not determine whether the alleged breach of care was simple negligent treatment [which is reasonably foreseeable, and therefore, not an intervening cause of death] or grossly negligent treatment [which may break the chain of causation]. It is without dispute that, without medical treatment on April 21, 1997, [the victim] would have died from the injuries sustained as a result of the gunshot wound. Thus, it was reasonably foreseeable that [the victim] would have died from the gunshot wound inflicted by [Thomas]. [Thomas] cannot establish any prejudice resulting from the alleged failure of counsel to consult a neurologist or otherwise more effectively challenge the State's expert witnesses.
>
> Moreover, although we need not address the deficient performance prong of *Strickland*, we conclude that counsel was not deficient for failing to consult a neurologist and/or for failing to conduct a more effective cross-examination of the State's expert witnesses. The proof at the post-conviction hearing established that [Thomas's trial counsel] were aware of

the import of the issue of causation, although causation relative to [Thomas] was a secondary defense. Counsel did acknowledge that causation was [Petitioner]'s primary defense. In this regard and in lieu of their collegial working relationship, counsel for [Thomas] worked closely with counsel for [Petitioner] on the medical causation issue. The proof at the post-conviction hearing established that counsel for both [Thomas] and [Petitioner] consulted other medical experts who reached the same or substantially similar conclusion as the State's experts. Counsel made a reasoned decision, with consideration of the results, funding, and time, to stop investigating additional experts. Similarly, we do not find counsel's cross-examination of the State's experts deficient nor do we find counsel's failure to object to their testimony on the basis that the testimony was cumulative to be deficient. [Thomas's trial counsel]'s cross-examination of the State's expert witnesses was thorough and focused upon the differences in their opinions. Petitioner is not entitled to relief on this issue.

*Id*., 2011 WL 675936, at *30.

Turning to the evidence presented in this case, Petitioner's trial counsel acknowledged that because Petitioner had previously admitted guilt to participating in the robbery, Petitioner's only viable defense was whether there was an intervening cause of death sufficient to interrupt the causal chain and absolve Petitioner of criminal responsibility. Counsel thoroughly investigated the issue, reviewing the victim's voluminous medical records with the assistance of medical professionals and consulting more than one expert. Counsel testified that none of the experts he consulted could testify to a reasonable degree of medical certainty that the victim's cause of death was not related to the gunshot wound. We conclude that counsel adequately investigated the defense.

Petitioner asserts that counsel was deficient for failing to call as a witness Dr. Steven Horowitz, who testified at co-defendant Thomas's post-conviction hearing. As summarized by this court in the direct appeal in that case, Dr. Horowitz testified as follows:

Dr. Horowitz testified extensively as to the cause of [the victim]'s paralysis. To succinctly summarize his testimony, Dr. Horowitz opined that the paralysis was caused by medically-induced hypotension as a result of a breach in the standard of medical care by the attending staff at The Med. Dr. Horowitz concluded that there was no connection between the bullet wound and [the victim]'s subsequent neurological deficits and ultimate death. He added that the cause of [the victim]'s death was "[a]n overwhelming infection, uncontrollable diabetes with the state of diabetic

-7-

ketoacidosis and an inability to clot because of the C[o]umadin toxicity." Dr. Horowitz admitted, however, that had [the victim] not been shot on April 21, 1997, there would have been no reason for him to die on October 2, 1999.

. . . .

At the post-conviction hearing, Dr. Horowitz attributed the victim's paralysis not to the gunshot wound but to hypotension resulting from wrongful medical treatment. He opined that this paralysis eventually led to the victim's neurogenic bladder and eventual death.

*Id*. at *28-29.

We conclude that Petitioner's trial counsel was not deficient. Counsel consulted medical experts who were unable to unequivocally refute the testimony of the State's expert as to the victim's cause of death. Evaluating counsel's performance from counsel's perspective at the time of Petitioner's trial, *see Henley v. State*, 960 S.W.2d 572, 583 (Tenn. 1997), we conclude that counsel exercised reasonable professional judgment after a thorough investigation.

Furthermore, although we need not address the second prong of *Strickland*, Petitioner has failed to show prejudice as a result of trial counsel's failure to present the testimony of Dr. Horowitz at the trial. As this court noted in co-defendant Thomas's appeal, Dr. Horowitz's testimony was legally insufficient to alter the conclusion that it was the victim's gunshot wound that ultimately caused his death. In order for a defendant to be insulated from criminal responsibility, the victim's death must be so "unexpected, unforeseeable or remote" that the defendant's actions could not legally be the cause of the death. *See State v. Randolph*, 676 S.W.2d 943, 948 (Tenn. 1984). Negligent medical treatment received as a result of the defendant's criminal conduct is foreseeable and will not break the chain of causation. Medical treatment that is so deficient as to constitute gross negligence is not reasonably foreseeable. *See People v. Saavedra-Rodriguez*, 971 P.2d 223, 226 (Colo. 1999). However, in *Saavedra-Rodriguez*, cited by this court in *Andrew Thomas v. State*, 2011 WL 675936, the Colorado Supreme Court analyzed the issue as follows:

The inquiry should focus on whether the wound inflicted by the defendant is the type of wound that would generally endanger or destroy life and from which the victim would likely die if little or no treatment is provided. Accordingly, *a defendant is not relieved of liability, even in the face of grossly negligent medical treatment, if the original wound would likely have*

*been fatal without the treatment.* Conversely, if the wound inflicted upon the victim would probably not have been fatal, but the victim dies as a result of the physician's grossly negligent treatment, the physician's gross negligence is an intervening act that relieves the defendant of criminal liability for the death.

*Saavedra-Rodriguez*, 971 P.2d at 227 (citations omitted) (emphasis added).

Dr. Horowitz acknowledged that the victim "probably would have died" had the gunshot wound gone untreated. Therefore, even if the jury accepted Dr. Horowitz's opinion that the victim received negligent medical treatment, the negligent treatment does not amount to an intervening cause in this case. Defendant is not entitled to relief.

## CONCLUSION

The judgment of the post-conviction court is affirmed.

_____
THOMAS T. WOODALL, JUDGE